Ray Anthony Mallisham, a coal miner employed by Jim Walter Resources, Inc. (JWR), was injured in a mining accident. He brought an action against the following employees of JWR: Nathaniel Hawkins, Mallisham's section foreman; Frank Blake, the assistant mine supervisor; John Norfleet, the assistant mine safety supervisor; Tommy Kiker, the mine safety supervisor; James Beasley, the mine foreman in charge of mine operations and safety; Art Sullivan, the mine safety director; and William Carr, the president of the mining division of JWR. Mallisham's complaint alleged that these employees had willfully caused the safety mechanisms and roof control supports in the area of the coal mine where he was working not to be installed as required by JWR's safety regulations and by federal law. He alleged that this willful conduct proximately caused his injuries. The court entered a summary judgment in favor of Norfleet, Kiker, Beasley, Sullivan, and Carr, and a partial summary judgment in favor of Blake and Hawkins. The trial court made these summary judgments final pursuant to Rule 54(b), Ala.R.Civ.P.; Mallisham appeals. The principal issue is whether Mallisham presented substantial evidence that the failure to install roof support timbers constituted the "removal from a machine of a safety guard or safety device provided by the manufacturer," within the meaning of Ala. Code 1975, § 25-5-11(c)(2).
On December 16, 1988, Mallisham was working on the evening shift, 3:00 to 11:00 p.m., as a miner helper when he was injured in an accident inside the number five mine. His task was to handle the electric cables that powered a "miner." A "miner" is a machine approximately the size of a small railroad car; it is a large rotating spike drum that claws into the coal seam. Mallisham was standing in the mine shaft behind the "miner," which was grinding into the coal seam in front of him, when a large boulder rolled out of the wall beside him and pinned him to the ground, severely injuring him.
The walls of a mine shaft are known as "ribs." The release of a boulder out of the wall of the mine shaft is known as a "rib roll." Six-inch by six-inch wooden timbers, which vary in length depending on roof height, are placed at certain intervals along the ribs to support the ribs of the mine and prevent rib rolls, such as the one that injured Mallisham. These timbers are required by *Page 422 
JWR's safety regulations and by federal safety regulations if certain mining conditions exist.
There are two general types of mining relevant to this case, single-seam mining and twin-seam mining. Single-seam mining involves tunneling through a single seam of coal, where the roof height is usually no greater than seven feet. Twin-seam mining involves mining first a single seam of coal and then an additional seam of coal that is above the first seam and separated from it by a layer of rock. When a mining crew cuts out the layer of rock to mine the second seam of coal, the roof height often is increased to more than seven feet. According to JWR's safety regulations, when miners are involved in twin-seam mining and the resulting roof height exceeds seven feet, the ribs must be supported by timbers or other safety devices. Joe Anthony Box, the foreman of the day shift in the number five mine, stated in his affidavit that JWR safety regulations require that a timber be positioned along the rib wall every time twin-seam mining operations increase the length of the mine shaft by approximately 17 feet. In other words, if the roof height exceeds 7 feet, there must be a timber installed every 17 feet along the rib wall. At the time of the accident the crew with which Mallisham was working was engaged in twin-seam mining, which had increased the roof height to 8 feet, 6 inches, and the mine shaft extended approximately 48 feet without timber support.
Box stated in his affidavit that on the day of the accident he ordered timbers, but did not receive them. He said he nevertheless continued mining operations for approximately 40 feet without setting any timbers. Box stated that while his crew was mining without the timbers, he stopped mining activities twice because he heard loud cracking and popping in the roof, which, he said, "indicated [that] the surrounding rock and rock roof was cracking and shifting and was very unstable." When the day shift was over, Box said, he told Hawkins and another employee, who is not a party to this action, "that the roof was dangerous and unstable and that timbers had not been set and not to begin mining operations until those timbers had been set." Box also said he told Blake about the unstable conditions within section number six, the area where the accident occurred in the number five mine. Box stated that Blake and Hawkins "assured [Box] that mining operations would not begin on that section until the timbers had been set."
It is not clear from the evidence who ordered that work commence,[1] but the evening crew, after waiting an unspecified time for the timbers, began work without placing timbers in the mine shaft. Shortly after the crew began work, the accident occurred. The Mine Safety and Health Administration later investigated the accident and issued a safety violation citation to JWR.
Mallisham brought this action against the JWR employees under § 25-5-11, Ala. Code of 1975. That section allows an employee injured in the scope of his employment to bring an action in certain instances against his co-employees for damages for his injuries, notwithstanding any recovery he may be entitled to under Alabama's Workers' Compensation Act. Section 25-5-11(b) reads as follows:
 "If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any officer, director, agent, or employee of the same employer . . ., the employee shall have a cause of action against the person. . . ."
Section 25-5-11(c) defines "willful conduct" to include the following: *Page 423 
 "(1) A purpose or intent or design to injure another; and if a person, with knowledge of the danger or peril to another, consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he or she is guilty of 'willful conduct.'
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P. Once the moving party makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue of fact. Ala. Code 1975, § 12-21-12; Specialty ContainerMfg., Inc. v. Rusken Packaging, Inc., 572 So.2d 403 (Ala. 1990). Section 12-21-12, Ala. Code 1975, requires proof by "substantial evidence" in order to "submit an issue of fact to the trier of facts." Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
The first issue is whether the defendants willfully and intentionally "remov[ed] from a machine . . . a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal." Ala. Code 1975, § 25-5-11(c)(2). There is no evidence that the timbers, if they were construed to be a "safety guard or safety device," were removed from a "machine." What the plaintiff alleges was a safety guard or device was a set of timbers, pieces of wood — these timbers were not "remov[ed] from a machine," but were never placed, as required, along the wall, or rib, of a mine shaft. "A statute must be construed as a whole, and every word in it made effective, if possible." State v. Jones, 289 Ala. 353, 358, 267 So.2d 427,431 (1972). "Courts are supposed to interpret statutes, not to amend or repeal them under the guise of judicial interpretation." Parker v. Hilliard, 567 So.2d 1343, 1346
(Ala. 1990).
Mallisham cites State v. Birmingham Rail Locomotive Co.,259 Ala. 443, 66 So.2d 884 (1953). The Court in Birmingham Rail
held that the rails upon which coal cars travelled within mines were "machinery used in mining," for purposes of the Alabama Sales Tax Act, which exempted machinery used in mining from taxation. The Court accepted the trial court's finding that the rails were a necessary part of the machinery used in transporting the coal to the surface, relying in part on the fact that the rails were attached loosely and were moved as mining sites changed. Although the rails used in BirminghamRail could reasonably be viewed as part of the machinery for removing the coal to the surface, the timbers here, even when properly positioned, would not have been connected with any machine, but would have been affixed to the wall of the mine itself. A mine is not a machine, so the timbers simply were not a part of any machine.
Mallisham argues that mining safety is not as concerned with machines as manufacturing safety is, and that § 25-5-11(c)(2) should be extended in the mining context to devices pertaining to the safety of the mine itself. However, such a construction of § 25-5-11(c)(2) would not reasonably conform to the terms of the statute. The legislature has retained a limited right of action against a co-employee under § 25-5-11(c)(2) for the removal of a manufacturer's safety device from a machine, not the removal or omission[2] of any safety device from any workplace *Page 424 
place environment. Such a change in the law must be left to the legislature.
The circuit judge correctly held that the support timbers were not a part of a "machine" for purposes of § 25-5-11(c)(2). Thus, the conduct alleged did not come within that section's definition of "willful conduct," and the summary judgment for all defendants as to this aspect of the complaint is due to be affirmed.
The summary judgment was also proper for the defendants Norfleet, Kiker, Beasley, Sullivan, and Carr on the issue of whether they may be held liable for "willful conduct" as defined in § 25-5-11(c)(1). That definition of willful conduct requires a "purpose or intent or design to injure another." Mallisham presented no evidence that any of these defendants even knew of the decision to send him and the rest of the crew into the mining shaft without the timbers being installed, and, thus, certainly no evidence of a purpose, intent, or design to injure. Therefore, the summary judgment for these five defendants as to this aspect of the complaint is also due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and HOUSTON, KENNEDY and COOK, JJ., concur.
[1] James Beasley stated in his deposition that, after the accident, Hawkins told him that Hawkins and the evening crew had waited for the timbers to arrive, and that Hawkins had telephoned Blake and told him that the timbers were not there. Beasley said that Hawkins told him that Blake had told Hawkins to commence mining operations anyway. However, Beasley also said that he spoke to Blake and that Blake said he never told Hawkins to go into the mine without the timbers being set. Mallisham states in his deposition that Hawkins received a call from Blake asking Hawkins why he had not begun mining, and that when Hawkins told him that he had not begun mining because they were without timbers, Blake ordered him to commence mining without them. No issue is presented as to the admissibility of this evidence.
[2] See Bailey v. Hogg, 547 So.2d 498 (Ala. 1989).