Eddie WILLIAMS, Plaintiff,

v.

CHAMPION INTERNATIONAL CORPORATION, et al., Defendants.

No. 94–D–1417–S.

United States District Court, M.D. Alabama, Southern Division.

Aug. 24, 1995.

Samuel L. Adams, Dothan, AL, for plaintiff.

Thomas W. Christian, Charles J. Kelley, Robert E. Cooper, Birmingham, AL, for defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Presently before the court is Defendants' "Motion for Partial Summary Judgment" accompanied by supporting briefs, exhibits and affidavits, filed May 31, 1995. The Defendants specifically move for summary judgment on plaintiff's retaliatory discharge and co-employee liability claims. Plaintiff submitted a brief in opposition to the Defendants' motion on June 20, 1995. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court finds that the defendants' motion is due to be granted in part and denied in part.

### JURISDICTION & VENUE

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties, *see Owen Equipment & Erection Company v. Kroger,* 437 U.S. 365, 373–74, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), and the amount in controversy exceeds $50,000, exclusive of interest and costs.[1] Personal jurisdiction and venue are uncontested.

### FACTS

Eddie Williams (hereafter "Williams" or the "Plaintiff"), commenced this action on October 13, 1994 against Champion International Corporation (hereafter "Champion"), asserting claims for workers' compensation and retaliatory discharge pursuant to *Alabama Code* § 25-5-11.1 *et seq.* (1975) (Workers' Compensation Act, as amended 1992). The defendants removed the action to federal court on November 3, 1994. Subsequently, Williams amended his complaint to add the following co-employee defendants: David Blackmon (hereafter "Blackmon"), John Noffsinger (hereafter "Noffsinger") and Jerry Whitehead (hereafter "Whitehead").[2] Williams claims that Champion wrongfully terminated him for filing a workers' compensation claim. Williams also claims that the co-employee defendants removed safety guards or devices or willfully and intentionally violated Champion's safety rules.

1. The plaintiff is a citizen of Alabama. The defendant Champion is a corporation organized and existing under the laws of New York. Champion maintains its principle place of business in Connecticut.

2. Williams amended his complaint on February 6, 1995.

In 1982, Champion hired Williams as a laborer. His job consisted of pulling lumber from a chain conveyor. *See* Pl. dep., p. 22. In 1986, the Plaintiff was promoted to forklift operator. His duties entailed stacking bundles of lumber in the shipping areas and pushing buggies in the kiln dry area. Pl. dep., pp. 43, 44. At the outset, Plaintiff operated a Y–12 model forklift. The Y–12 was replaced with the larger and more modern Y–15 model which the plaintiff drove for approximately five years before his accident. *Id.* at 52. Champion acquired two Y–15 forklifts: "No. 1" which was used in the kiln dry area and "No. 2" which was used in the planer area. Glover aff., ¶ 3.

In February 1993, Plaintiff began complaining to Whitehead, his supervisor, about the seat on "No. 2". Plaintiff contends that the seat on the forklift was torn and "needed new shocks up under it because it wouldn't release like it should." Pl. dep., pp. 57–58. Williams contends that he complained about the seat in safety meetings, in Whitehead's presence. Williams stated that he also complained to Lamar Glover (hereafter "Glover"), Champion's maintenance person. *Id.* at 58–59, 63. Williams avers that initially, both Whitehead and Glover told him that nothing was wrong with the subject seat. *Id.* at 62–63. Williams also claims that Blackmon told him that two other persons had also complained about the seat. *Id.* at 63.

Whitehead asserts that, in April 1993, he noticed that the seat on the "No. 2" was worn out and torn around the edges. Whitehead claims that he reported this discrepancy to Glover and recommended that the seat be refurbished. Thereafter, Glover removed the seat from the Y–12 model forklift, which was no longer being used at Champion, and temporarily installed it on the Y–15 model forklift. According to the Defendants, the seat removed from the Y–12 was in good condition because it had been re-covered prior to the forklift being placed on inactive status. Defendants also contend that the Y–12 seat had the same adjustments, attachments, mounting brackets, bolt pattern and dimensions as the Y–15 seat. Whitehead aff., ¶ 3–5; Glover aff., ¶ 4–6.

Margie Hines (hereafter "Hines"), Champion's purchasing supervisor, completed the paperwork for the re-covering of "No. 2's" seat on April 7, 1993. C & S Upholstery (hereafter "C & S") contracted to complete the job on or before April 12, 1993. Hines aff., ¶ 2; Def.Ex. A. Glover asserts that after C & S returned the seat he installed it on "No. 2" and that the seat functioned "properly and correctly." Glover aff., ¶ 8. Glover testifies that he neither welded the seat to the forklift nor modified any component part of the seat. *Id.* at ¶ 6.

On April 27, 1993, while operating the forklift faster than usual, Plaintiff drove the forklift across a set of railroad tracks and lost control. The forklift began to bounce and eventually jammed Williams' back. Pl. depo., pp. 66–67. Contrary to the Defendants' contentions, Plaintiff avers that Glover welded the temporary replacement from the Y–12 model forklift onto the Y–15 model. Williams claims that this was the reason the seat could not slide forward or backward or absorb shock. Plaintiff asserts that he was sitting on a "piece of steel" while operating the subject forklift. *Id.* at 55. Plaintiff contends that the original seat had not been re-installed on "No. 2" at the time of his accident.

Following his work-related accident, Williams began to collect workers' compensation benefits. Dr. W.B. Hanson (hereafter Dr. "Hanson") of the Dothan Bone & Joint Clinic released Plaintiff, on May 25, 1993, to return to light work for about a week. After which time, Plaintiff was to return for a follow up review. Dr. Hanson stated in his progress report that if Plaintiff was not better at this point that it might be necessary to perform an epidural. Dr. Hanson stated in an addendum to his progress notes that plaintiff stated he was not going back to work until he got better. At that point, Dr. Hanson asked plaintiff to return in one week to see his partner, Dr. J.P. Maddox (hereafter Dr. "Maddox"). Def.Ex. 7. Dr. Maddox saw Williams on June 4, 1993 at which time he released Plaintiff to return to a light duty job. *See* Def.'s Ex. 9.

On June 3, 1993, Candace Ward (hereafter "Ward"), Champion's Administrative Clerk of

Personnel, mailed a certified letter informing Plaintiff that he needed to come in on June 8, 1993 and talk to Tommy Williams (hereafter "T. Williams"), Champion's Controller, regarding a light duty position which met Dr. Hanson's restrictions. Plaintiff received the letter on June 7, 1993. The letter also set forth potential ramifications for failure to report to work.

Plaintiff contends that after he received the letter he called T. Williams to discuss said light-duty position. Plaintiff avers that the light-duty work contemplated by Champion entailed sweeping and picking up trash. Pl. depo., p. 100. On June 14, 1993 Plaintiff allegedly communicated with someone from the office of Champion's workers' compensation insurer and requested a second opinion regarding his physical condition. Fay Gilbert (hereafter "Gilbert"), Champion's Worker's Compensation Administrator, mailed a list of physicians for Plaintiff to select from. Ms. Gilbert explained to Plaintiff that until she received an opinion different from those of Dr. Hanson and Dr. Maddox, Plaintiff's benefits would be terminated because he had been cleared to return to work.

Plaintiff chose Dr. J. Bret Simpson (hereafter Dr. "Simpson") of Dothan Orthopedic Associates, P.C. Ward aff., ¶ 3. Dr. Simpson treated Williams for approximately two months. During this time, plaintiff never called anyone at Champion to discuss his status. Pl. depo., p. 109. On August 19, 1993, Dr. Simpson noted that Plaintiff should begin a work hardening program. Dr. Simpson stated that "[h]e is okayed back to a light duty status at work basically a desk job." Def.Ex. 13. Ward sent Plaintiff another certified letter on August 23, 1993, stating that she expected him to return to work. The letter stated that plaintiff should contact her or T. Williams regarding his intentions to resume work.

Defendants contend that arrangements were made for Plaintiff to begin work in a light duty position in Champion's purchasing department. According to Champion, the scheduled work hours were 8:00 a.m. to 11:30 a.m.; afterwards, Plaintiff would be permitted to attend therapy sessions from 1:00 p.m. to 5:00 p.m. Def.Mot.Part.Summ.J., p. 6.

Plaintiff testifies that he called Ms. Ward and informed her that he was unable to return to work due to the pain in the left side of his back and leg. Plaintiff asserts that he could hardly sit or stand and that he could not drive. Pl. depo., pp. 114–116.

Williams claims that two weeks before his termination, he received a phone call from T. Williams. After Plaintiff explained the reasons why he was unable to return to work, T. Williams allegedly told Plaintiff that he would not receive any more workers' compensation benefits and that he would probably be terminated. *Id.* at 121, 125. On August 31, 1993, Noffsinger notified Plaintiff of his termination of employment with Champion. Def.Ex. 14. Subsequently, Plaintiff underwent surgery to correct a herniated disc.

*SUMMARY JUDGEMENT STANDARD*

On a motion for summary judgment, the court must construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. *See also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

## DISCUSSION

### I. Retaliatory Discharge

The traditional employment at will rule still governs in Alabama. The rule provides that an employment contract is generally terminable at will by either party, with or without cause or justification—for a good reason, a wrong reason, or no reason at all. *Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725 (Ala.1987). Realizing the harsh effects of the employment at will doctrine, the Alabama State Legislature created an exception to the general rule by enacting *Alabama Code § 25-5-11.1. See McClain v. Birmingham Coca–Cola Bottling Co.,* 578 So.2d 1299 (Ala.1991). Section 25–5–11.1 provides:

> "[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover worker's compensation benefits under this chapter or solely because the employee has filed a written notice of violation of a safety rule pursuant to subdivision (c)(4) of section 25–5–11."

*Ala.Code § 25–5–11.1.*

In retaliatory discharge actions, the Alabama Supreme Court has held:

> "[A]n employee must establish a prima facie case of retaliatory discharge by proving that he was 'terminated' because he sought to recover worker's compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the employee must prove that the reason [given by the employer] was not true but pretext for an otherwise impermissible termination."

*Overton v. Amerex Corp.,* 642 So.2d 450, 452 (Ala.1994) (quoting *Twilley v. Daubert Coated Products, Inc.,* 536 So.2d 1364, 1369 (Ala. 1988)); *see also Continental Eagle Corp. v. Mokrzycki,* 611 So.2d 313, 317 (Ala.1992). A plaintiff establishes a prima facie case of retaliatory discharge by proof that "he had filed a workers' compensation claim for a work-related injury, that the injury prevented him from working for a period of time, and that when he returned to work he was informed that he no longer had a job." *Id.* at 452 (citing *Culbreth v. Woodham Plumbing Co.,* 599 So.2d 1120, 1122 (Ala.1992)).

When a defendant moves for summary judgment on a plaintiff's retaliatory discharge claim under Ala.Code § 25–5–11.1 and the defendant supports said motion with evidence of a legitimate reason for terminating the plaintiff, the plaintiff must debunk that demonstration. *Culbreth,* 599 So.2d at 1122. However, a "plaintiff has no burden to produce evidence before trial until the defendant has made and properly supported a motion for summary judgment." *Overton,* 642 So.2d at 452 (citing *Culbreth,* 599 So.2d at 1122).

In viewing the evidence in the light most favorable to Williams, the court finds that Plaintiff has constructed a prima facie case of retaliatory discharge. Williams sustained a back injury while driving a forklift at Champion. He was purportedly unable to work for approximately four months—from the date of his injury, April 27, 1993, until the date of effective termination August 26, 1993. Subsequently, he filed for workers' compensation benefits. Plaintiff stated that he was unable to return to work during this period because of unyielding pain. Williams' termination ensued.

Champion asserts that its decision to terminate Williams was simply a business decision precipitated by Williams' refusal or failure to contact them and make arrangements to return to work. Specifically, Champion claims that: (1) three different doctors, Dr. Hudson, Dr. Maddox, and Dr. Simpson, released Williams to return to a light duty work status; (2) on two different occasions, via certified letters, Champion notified Williams of their desire for him to return to work; (3) Champion had arranged for a desk job for Williams in the purchasing department with favorable work hours (from 8:30 a.m.—11:30 a.m.); (4) Champion's letters to Williams demanded that Williams contact them regarding his intentions of returning to work; (5) Williams failed to reply to any of their letters or requests; and (6) Williams failed to return to work at Champion, despite being cleared to do so.

Plaintiff, through his testimony, refutes these contentions and alleges that they are untrue. Plaintiff asserts that he replied to both letters mailed by Champion. Plaintiff asserts that after receiving the first letter, he called T. Williams to discuss available work. T. Williams allegedly told Plaintiff that the job selected by Champion involved sweeping and picking up trash. Williams contends that sweeping and picking up trash would aggravate his back and, therefore, did not return to work. Plaintiff denies that anyone at Champion ever discussed a desk job with him. After receiving the second letter, plaintiff contends that he contacted Ward in the personnel department and explained that he was: still experiencing pain; unable to drive; and unable to control his bowels as a result of receiving medically necessary injections. Plaintiff also contends that two weeks before his termination, T. Williams called his home and told him that he was not going to receive any more workers' compensation benefits, and that Plaintiff would probably be fired.

It is well settled under Alabama law that the Workers' Compensation Act is to be liberally construed to effect its beneficent purposes by resolving all reasonable doubts in favor of the claimant. *Riley v. Perkins,* 282 Ala. 629, 213 So.2d 796 (1968); *Tiger Motor Co. v. Winslett,* 278 Ala. 108, 176 So.2d 39 (1965). Here, the facts and testimony presented by the parties are sharply disputed; therefore, the court finds that a genuine issue of fact exists as to whether the reasons asserted by Champion are legitimate or merely pretextual. If Champion's version of the facts are true and plaintiff failed to respond to Champion's letters or return to work after being released on several occasions by three different doctors, then a jury could find for Champion. However, if the trier of fact finds Champion's version of the facts to be untrue, then it could very well find for the Plaintiff, especially since he underwent elaborate back surgery shortly after his termination. Either way, the court finds that there is a genuine issue of material fact which precludes summary judgment.[3]

3. The court notes that at this juncture it is not its responsibility to weigh the evidence but, rather, to determine if a genuine issue of material fact exists. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In so determining, the court must view all evidence and reasonable inferences

## II. Co-employee Liability

Plaintiff, via his amended complaint dated February 6, 1995, specifically avers that co-employee defendants Blackmon, Noffsinger, and Whitehead intentionally installed or allowed to be installed an unsafe seat on the "No. 2" forklift knowing that such installation would cause plaintiff serious injury. Plaintiff further avers that the co-employee defendants removed safety guards or devices which willfully and intentionally violated safety rules of the plaintiff's employer. Pl. Compl., ¶ 7.

Section 25–5–11(b) provides a cause of action against persons who willfully cause personal injury or death to co-employees.[4] According to section 25–5–11(c)(2) willful conduct means:

. . . . .

"(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."

. . . . .

*Ala.Code* § 25–5–11(c)(1)(2).

■ Common sense and rational thinking prevail in the case and compel the conclusion that neither of the co-employee defendants is guilty of willfully causing Plaintiff's injury. Assuming arguendo that the seat complained of is a safety device to which *Ala.Code* § 25–5–11(c)(2) applies, the court finds as a matter of law that none of the individually named co-defendants acted willfully. As stated in *Layne v. Carr,* 631 So.2d 978 (Ala.1994),

"[s]ection 25–5–11(c)(2) cannot be construed to allow a co-employee action in every situation where an employee is injured on the job." *Id.* at 982.

Williams contends that during safety meetings, he informed Whitehead about the problem with "No. 2's" seat. Plaintiff further claims that Blackmon was informed about the problem with the seat by two other employees. Therefore, plaintiff feels that both Blackmon and Whitehead should be held liable in their supervisory capacities. Plaintiff also included Noffsinger, the plant manager, as a co-employee defendant. However, plaintiff has not provided any evidence whatsoever which raises the slightest inference that Noffsinger willfully caused his injury. Pl.Mem.Opp. to Def.Mot.Summ.J. at p. 8.

Williams is of the opinion that Whitehead reacted in an unconcerned fashion when he informed him of the deficient state of "No. 2's" seat. However, merely because a listener does not respond as enthusiastically as one desires does not mean that the responding party harbors deep-seeded or repressed animosity.

Candidly speaking, the evidence plaintiff has presented against his co-employees hardly rises to the level of willful conduct set out under § 25–5–11(c)(2). Defendant Whitehead, Plaintiff's supervisor, apparently did not act too unconcerned about the seat since he arranged for the seat to be recovered. Whitehead testifies that several weeks before Plaintiff's accident he noticed that the subject seat needed reupholstering. Whitehead notified Glover, who subsequently replaced the seat with a temporary seat from another forklift at the plant while the torn seat was out being reupholstered. *See* Def.'s Ex. A (purchase order to recover and repair seat by 4/12/93) The seat from the Y–12 was identical to that of the Y–15 in that it had all the same adjustments, attachments, mounting brackets, bolt pattern and dimensions as the Y–15. Other than notifying Glover about the

drawn therefrom in a light most favorable to the nonmoving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

4. Section 25–5–11(b) provides:

If personal injury or death to any employee results from the willful conduct ... of any ... employee ... the employee shall have a cause of action against the person ...
Ala.Code § 25–5–11(b).

subject seat, Whitehead asserts that he had no other direct or indirect involvement in the seat being removed, repaired or replaced. Of greater import, Plaintiff does not allege as much.

The court also points out that Whitehead had no responsibility in the maintenance of Champion's forklifts. *See* Whitehead aff., ¶ 5. When the seat was returned to the plant, Glover reinstalled it onto the "No. 2" forklift before plaintiff had his accident. Glover testified that the seat functioned properly and correctly after being reinstalled. *See* Glover aff., ¶ 5, 6.

As pointed out in *Layne*, "[e]vidence showing only knowledge and an appreciation of the risk of injury or death, short of a substantial certainty ... is insufficient for showing willful conduct." *Id.* Here, plaintiff has failed to provide any tangible evidence that either of the co-employee defendants had any real knowledge or appreciation of his injury. After all, plaintiff himself testified that he was going rather fast when he crossed the railroad tracks and lost control. *See* Pl. dep., 55. Moreover, Plaintiff cedes that he had never had an accident before while driving the forklift. *See* Pl. dep., pp. 40–50. Therefore, it appears very unlikely that defendants would have foreseen an injury to plaintiff as a result of installing the temporary seat.

As far as Blackmon is concerned, it is apparent that he, like Whitehead, had no involvement in the repair, replacement or removal of the seat on the Y–15 forklift. Blackmon testifies that the Plaintiff told him that the seat was hurting his back. Blackmon, in turn, told plaintiff he should make this concern known to his supervisor. The court finds that this conversation, in and of itself, does not constitute willful misconduct. Further, the fact that Blackmon allegedly told plaintiff that two other employees had complained seems immaterial because no employee ever complained of injury arising from the use of the forklift generally, and from the seat, specifically. Therefore, in viewing the evidence in a light most favorable to the Plaintiff, the court finds that the Plaintiff has failed to demonstrate that the named co-defendants willfully caused his injury. Consequently, the individually named defendants are entitled to summary judgment on the Plaintiff's co-defendant liability action.

### CONCLUSION

The court concludes that Plaintiff has presented evidence sufficient to survive Defendants' motion for summary judgment on Plaintiff's retaliatory discharge claim. While the defendants have asserted reasons for having discharged plaintiff, the ultimate determination of whether the proffered reasons are legitimate or pretextual is an issue for the jury, as the court finds that a genuine issue of material fact exists.

On the other hand, Williams has produced no evidence that either of the co-employee defendants intended, or deliberately sought, to cause his injury. All affidavits submitted by the co-employee defendants deny that they had any involvement in the repair, maintenance, installation, or otherwise of the "No. 2" Y–15 forklift. Plaintiff produces nothing more than bare bones allegations in opposition. Therefore, the court concludes that plaintiff has failed to provide the necessary evidence to prevail on his co-employee liability claim. Since plaintiff has failed to prove that the co-employees acted willfully or intentionally, whether the seat on the forklift is, or is not, a safety device or safety guard within the purview of § 25–5–11(c)(2) is irrelevant. Therefore, the court concludes that Williams cannot prevail on his co-employee liability claim. For the foregoing reasons, it is

CONSIDERED and ORDERED that Defendant's motion for summary judgment on Plaintiff's retaliatory discharge claim be and the same is hereby DENIED. It is further

CONSIDERED and ORDERED that Defendants' motion for summary judgment on Plaintiff's action for co-employee liability be and the same is hereby GRANTED.